IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| JANI JOHNSTON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Case No. 06-1566-KI |
| | ) | |
| vs. | ) | OPINION AND ORDER |
| | ) | |
| PET'S RX, INC., dba VCA RALEIGH | ) | |
| HILLS ANIMAL HOSPITAL, a Delaware | ) | |
| corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Shelley D. Russell
Crispin Employment Lawyers
500 Plaza West, 9600 S.W. Oak Street
Portland, Oregon 97223

      Attorney for Plaintiff

Carol J. Bernick
Derek D. Green
Davis Wright Tremaine LLP
1300 S.W. Fifth Avenue, Suite 2300
Portland, Oregon 97201

      Attorneys for Defendant

Page 1 - OPINION AND ORDER

KING, Judge:

Plaintiff Jani Johnston quit her job after allegedly suffering from sexual harassment, harassment due to injuries suffered in two non-work accidents, and being demoted while on vacation. Johnston alleges claims under Title VII, the Americans with Disabilities Act ("ADA"), the Family Medical Leave Act ("FMLA"), Oregon statutory versions of these acts, and for the torts of wrongful discharge and the intentional infliction of emotional distress. Before the court is the Motion for Summary Judgment of Defendant Pet's RX, Inc. dba VCA Raleigh Hills Animal Hospital (#14). For the reasons below, I grant summary judgment against all claims except the state and federal sexual harassment claims, the ADA interference claim, and the FMLA interference claim.

## FACTS

Defendant's predecessor hired Johnston as a veterinary technician in March 2004. Terry Ross, the Head Technician, made the hiring decision with the approval of then-owner Dr. Richard Werner. Ross became Johnston's supervisor. Defendant acquired the hospital in February 2005. Dr. Werner continued to work there for another year. Dr. Werner had authority over personnel management throughout Johnston's tenure. Mike McClure was the hospital manager and reported to Dr. Werner.

Johnston received and read defendant's employee handbook on February 1, 2005. It included descriptions of the anti-harassment, equal opportunity, and leave policies, plus the procedure for reporting employment concerns. The handbook states that any incident of harassment should be reported to the employee's supervisor, the hospital manager, the regional manager, or the corporate human resources department. The policy emphasizes that an employee

is not required to complain first to the supervisor if the supervisor is the person harassing the employee.

Johnston was in a non-work vehicle accident on February 28, 2005. She took time off work from February 28 through March 7, 2005, returning with restrictions for sedentary work, lifting no more than 10 pounds, and working five hours per day. The expected recovery time was four to six weeks. Johnston had a second non-work accident on April 4, 2005 and took another week off work. Her work restrictions lessened but did not end until after she was terminated. Bree Madison, of corporate human resources, twice sent Johnston information about family medical leave benefits with an application form but Johnston never returned the paperwork. Johnston does not remember ever requesting additional information about leave.

Defendant never denied Johnston time off she requested because of her injuries.

Ross constantly told Johnston that he thought she was faking her injury. He would ask her why she wasn't wearing a neck brace if she was in so much pain. The longer Johnston was on light duty, the more Ross harassed her. The harassment was on a daily basis. He complained about the limited hours that she could work and that she was causing the hospital to be short-staffed. Ross harassed Johnston about not being able to lift some of the animals due to her doctor's restrictions. Johnston complained to Dr. Franklin, medical chief of staff, Dr. Werner, and McClure.

Johnston witnessed or heard about Ross treating many other employees, who did not have physical injuries or work restrictions, inappropriately and disrespectfully. Other staff had complained about Ross' conduct.

In late May 2005, Ross telephoned Johnston's doctor's office and had an unpleasant conversation with the nurse. Johnston learned of the conversation from the nurse. When

Johnston confronted Ross about violating her privacy, he told her that he wanted to find out why the dates did not correspond on her work release and why she needed to have the time off.

Johnston complained to Dr. Werner, McClure, and Dr. Franklin that Ross telephoned her doctor's office without her approval to inquire about her work restrictions. Ross was demoted for contacting Johnston's doctor. McClure recommended the demotion and Dr. Werner approved it. McClure also had heard other staff complaints about Ross yelling at people and being confrontational.

Johnston was promoted to Head Technician shortly after Ross' demotion. McClure and Dr. Werner made the decision with Dr. Werner having the final decision-making authority. Ross never made any comments to Johnston about her injuries after he was demoted.

After Johnston's promotion, she was in charge of scheduling approximately 30 employees. Ross complained directly to Johnston about a schedule change. Two employees, Amy Creel and Melissa Proctor, complained to the corporate human resources department that Johnston treated them differently because the employees were lesbians. McClure states that he spoke to Johnston about staff complaints that she was too hard on them. Johnston does not remember any comments from McClure that she was too harsh or tough on the employees and believes that she was a good manager.

Johnston identifies herself as a lesbian but did not discuss her sexual orientation with many people at work. Dr. Werner denies that he knew of her sexual orientation. Johnston claims that Dr. Werner stated after a meeting with human resources about the Creel and Proctor complaints against Johnston that "[t]hose fucking lesbians are just a bunch of troublemakers." Johnston Dep. 67:1-3.

Page 4 - OPINION AND ORDER

Johnston alleges that Dr. Werner made inappropriate comments to her over the course of her employment approximately two to three times a week.  Some of his specific remarks are that Johnston would make a good pole dancer, that if she were blond and had large breasts she could get whatever she wanted, and that employees looked hot in street clothes.  She claims that a lot of the employees talked openly about his sexually harassing comments.  Other employees told Johnston that Dr. Werner made "breast-related comments."  He said to Johnston once that women did not have any business being in the workplace.  Johnston states that Dr. Werner "talked to her breasts" and brushed against her multiple times.  Dr. Werner's comments stopped shortly after Johnston believes that Dr. Werner learned she was a lesbian.  Johnston objects to the fact that Dr. Johnston stopped making sexual comments to her because she thinks he did so to make a point, presumably about her sexual orientation.  She also complains that throughout her employment, Dr. Werner would ignore her concerns.

According to Dr. Werner, multiple staff complained to him about Johnston, at least two technicians quit, and a number of technicians and kennel personnel threatened to quit.  He had counseled Johnston to warn her that her conduct as a manager had to improve or she would be removed from the position of Head Technician.

While Johnston was on vacation in August 2005, Dr. Werner received more complaints and demoted her back to technician.  He tried to telephone Johnston about the change but did not reach her and never discussed the issue with her.  Dr. Werner told Roxanna Downing, the hospital administrator who had recently replaced McClure, that three technicians had quit because of Johnston and that he was losing good quality staff.  Dr. Werner wanted to move Ross back into the position.  Dr. Franklin had also told Downing that he did not think Johnston did a good job as Head Technician.

While she was on vacation, Johnston learned of her demotion from a friend at the hospital and resigned the day she was to return. Johnston did not think she could work for Ross after everything that had gone on. Her resignation letter to Dr. Werner stated: "I feel that you treated me unfairly with your decision to demote me from Head Technician while away on vacation. I find that your actions were extremely disrespectful and therefore created a hostile work environment to which I can not comfortably return." Green Decl. Ex. 1 at 40.

According to Johnston, she complained to corporate human resources about Dr. Werner's offensive comments either on the day she resigned or the day before. That was her first complaint to human resources about the situation. During that call, Johnston also complained about Ross' harassment. Prior to her promotion, Johnston did tell McClure that Dr. Werner was a chauvinist.

After Johnston quit and Ross was promoted again, he had performance issues and after about a year, was demoted a second time. Another year later, management met with Ross concerning continued performance issues and he voluntarily decided to quit.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

**DISCUSSION**

I.    Sex Discrimination

    A.    Disparate Treatment

Johnston alleges that she was demoted because of her sex, in violation of Title VII and

ORS 659A.030.

Defendant contends that Johnston cannot establish a prima facie case because she was not

performing her job adequately and was not treated differently than similarly situated male

employees.  Defendant notes that both Johnston and Ross were demoted after staff complaints.

Defendant also argues that the "same actor" inference defeats Johnston's claim because

Dr. Werner approved both her promotion and demotion only a few months later.

Johnston contends that her actions as supervisor were undermined on multiple occasions

without explanation.  She notes that one of the complaining employees made frequent complaints

about issues in the workplace.  Johnston notes Ross' eventual termination after his second

promotion, and questions how he could be promoted again to Head Technician unless

discrimination was the cause.  She also argues that the only thing that stopped Ross' harassment

of her was her position of authority over him for two months.  Johnston contends that she was

not a poor manager and claims she was never counseled about poor performance as a manager.

Finally, Johnston argues that defendant is not entitled to the benefit of the same actor inference.

She contends there is a factual issue on whether Dr. Werner was the primary decision maker on

her promotion because McClure recommended it.  Johnston also contends that it is artificial to

separate the decision to demote Ross from the decision to promote her because her promotion

was necessitated only by the vacancy created by Ross' demotion.

To prove a Title VII disparate treatment claim, a plaintiff must establish a prima facie case of discrimination. A prima facie case may be demonstrated by direct evidence of discriminatory intent or may be based on a presumption arising from factors set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Noyes v. Kelly Services, 488 F.3d 1163, 1168 (9th Cir. 2007). Generally stated, the factors are: (1) membership in a protected class; (2) qualification for the job or satisfactory performance of the job; (3) an adverse employment decision; and (4) different treatment than those similarly situated outside of the protected class. McDonnell Douglas, 411 U.S. at 802.

The requisite degree of proof necessary to establish a prima facie case for a Title VII claim on summary judgment "is minimal and does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). "The plaintiff need only offer evidence which 'gives rise to an inference of unlawful discrimination.' . . . Establishment of a prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." Id. (citations omitted). Once plaintiff has established a prima facie case, the burden of production shifts to the defendant to rebut the presumption of discrimination by articulating some permissible reason for the adverse action. Id. "Once the defendant fulfills this burden of production by offering a legitimate, nondiscriminatory reason for its employment decision, the . . . presumption of unlawful discrimination 'simply drops out of the picture.'" Id. (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993)).

Then the burden shifts to the plaintiff to show that the defendant's reason is a pretext for another motive which is discriminatory. Id. "When evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimal *prima facie* case based on a McDonnell Douglas type presumption." Id. at

890-91.  Plaintiff's own assertion of superior qualifications is insufficient without additional

evidence.  Blue v. Widnall, 162 F.3d 541, 546 (9th Cir. 1998).  Plaintiff is not required, however

to produce additional, independent evidence of discrimination at the pretext stage if the prima

facie case raises a genuine issue of material fact regarding the truth of the employer's proffered

reasons.  Chuang v. University of California Davis, 225 F.3d 1115, 1127 (9th Cir. 2000).  "[A]

plaintiff can prove pretext in two ways:  (1) *indirectly*, by showing that the employer's proffered

explanation is unworthy of credence because it is internally inconsistent or otherwise not

believable, or (2) *directly*, by showing that unlawful discrimination more likely motivated the

employer."  Noyes, 488 F.3d at 1170 (internal citation and quotation omitted).  "[I]n the context

of summary judgment, Title VII does not require a disparate treatment plaintiff relying on

circumstantial evidence to produce more, or better, evidence than a plaintiff who relies on direct

evidence."  Cornwell v. Electra Central Credit Union, 439 F.3d 1018, 1030 (9th Cir. 2006)

(noting tension with the Godwin v. Hunt Wesson, Inc., 150 F.3d 1217 (9th Cir. 1998), line of

cases and their standard requiring specific and substantial circumstantial evidence of pretext).

     The standard for establishing a prima facie case of discrimination under Oregon law is

identical to that used in federal law.  Henderson v. Jantzen, Inc., 79 Or. App. 654, 657, 719 P.2d

1322 (expressly adopting formulation in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802

(1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981) as test for

ORS Ch. 659 actions), rev. denied, 302 Or. 35 (1986).  Oregon courts rejected the

burden-shifting mechanism applicable to federal claims.  Hardie v. Legacy Health System, 167

Or. App. 425, 434-38, 6 P.3d 531 (2000), superseded by statute on other grounds as recognized

in Lansford v. Georgetown Manor, Inc., 192 Or. App. 261, 275 n.2, 84 P.3d 1104 (2004).  The

Ninth Circuit held, however, that when analyzing Oregon's disability discrimination statute, it

would apply the *McDonnell Douglas* burden-shifting analysis rather than Oregon's rule because the burden-shifting analysis was federal procedural law.  Snead v. Metropolitan Property Casualty Insurance Co., 237 F.3d 1080, 1090-93 (9th Cir.), cert. denied, 534 U.S. 888 (2001).

I will first address Johnston's prima facie case.  For the second prong, she contends that she was performing her job adequately, that McClure was supportive, and that she was not counseled.  There is evidence that several doctors did not believe that Johnston was managing properly and that there were multiple staff complaints about her, including two that were addressed by corporate human resources in a conference call which Johnston attended.

An employee's own statement that he was performing at a level equal to that of other employees is not enough to raise a genuine issue of material fact.  This rule pertains to the employee's evidence showing that the employer's reasons for the adverse employment action were false or discriminatory.  It does not apply, however, to the minimal showing needed to establish a prima facie case.  Aragon v. Republic Silver State Disposal, 292 F.3d 654, 660 (9th Cir. 2002).  Taking in mind that the required showing for the prima facie case is so minimal, I conclude that Johnston has sufficiently established the second prong, that she was performing her job adequately, to avoid summary judgment.

For the fourth prong, defendant contends that Johnston and Ross were treated similarly because both were demoted after being the subject of staff complaints.  This is true, but Ross was re-promoted about two months later.  That is enough for Johnston to establish that she was treated differently than a similarly situated man.  There is no argument that Johnston cannot establish the other two prongs concerning membership in a protected class and the occurrence of an adverse employment action.  Accordingly, I conclude that Johnston has established a prima facie case that is adequate to avoid summary judgment.

Defendant has sufficiently articulated its reason for demoting Johnston, namely, because of poor performance as a manager. The burden then shifts back to Johnston to show that the reason is a pretext for a discriminatory motive.

Johnston's argument centers on the fact that Ross was re-promoted almost immediately after McClure, who recommended Ross' demotion, left his position at the hospital. Johnston contends that this shows the reason for her demotion was pretextual. In response, defendant relies on the same actor inference concerning Dr. Werner.

If the same person is responsible for both the hiring and the firing of a discrimination plaintiff, and both events occur within a short period of time, a strong inference arises that there was no discriminatory motive. Bradley v. Harcourt, Brace, and Co., 104 F.3d 267, 270-71 (9th Cir. 1996) (one year between the events, citing with approval Lowe v. J.B. Hunt Transp., Inc., 963 F.2d 173 (8th Cir. 1992) (less than two years)); Coghlan v. American Seafoods Co. LLC, 413 F.3d 1090, 1091 (9th Cir. 2005) ("the point of the same-actor inference is that the evidence *rarely is* sufficient . . . to find that the employer's asserted justification is false when the actor who allegedly discriminated against the plaintiff had previously shown a willingness to treat the plaintiff favorably") (internal quotation omitted).

I disagree with Johnston that there is a factual issue on whether Dr. Werner was the primary decision maker with respect to Johnston's promotion. Dr. Werner was the prior owner of the hospital and even after its sale, retained the final authority on all personnel decisions, after taking recommendations from the staff. Further, the evidence shows that Dr. Werner actually used his authority. There is no factual issue questioning whether Dr. Werner made the final decision to promote Johnston and also to demote her. Thus, Johnston's reliance on Zambetti v. Cuyahoga Community College, 314 F.3d 249, 261-62 (6th Cir. 2002), is not persuasive. In

Zambetti, there was a factual issue on whether the hiring manager made the final decision about hiring the plaintiff or instead only completed the paperwork to implement his boss's decision. There is no reason Dr. Werner would be trying to please his subordinate, McClure, by implementing McClure's decision. The management order before me is reversed from that in Zambetti.

The time between Dr. Werner's two decisions concerning Johnston is very short–only two months. Johnston claims to be a good manager and argues that her decisions were undercut and she had to deal with subordinates who complained no matter who managed them. There is significant evidence, however, that multiple employees complained about Johnston's management style and Dr. Franklin, in addition to Dr. Werner, did not think she was doing a good job after the promotion.

"In judging whether . . . proffered justifications were false, it is not important whether they were *objectively* false (e.g. whether [plaintiff] *actually* lied). Rather, courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1063 (9th Cir. 2002) (emphasis in the original). Even if Dr. Werner was wrong in his assessment that Johnston was not performing the Head Technician role adequately, there is no evidence that he did not believe his reasons for her demotion. Additionally, both Johnston and Ross were demoted after defendant received complaints about their management style. The only troubling issue is that Ross was re-promoted. Ross did not quit after the first demotion, as Johnston did. If Johnston had stayed, she may also have been promoted back to Head Technician when Ross left the hospital.

The evidence supporting Johnston's argument is not strong and, in particular, is not sufficient to overcome the same actor inference. Consequently, Johnston has not raised a factual issue that defendant's reason for her demotion is a pretext for another motive which is discriminatory. I grant summary judgment and dismiss her Title VII and ORS Ch. 659A disparate treatment sex discrimination claims.

B.    Hostile Environment

Johnston alleges that she was subjected to a sexually hostile environment through the comments and physical conduct of Dr. Werner.

Defendant characterizes Dr. Werner's conduct as instances too few and isolated to support a sex harassment claim. Defendant also raises a *Faragher* defense because Johnston did not complain to the corporate Human Resources Department about the problem, as required by the employee handbook, until she resigned.

Johnston contends that Dr. Werner's comments were not isolated or merely teasing. She also argues that a factual issue prevents summary judgment based on the *Faragher* defense because Dr. Werner's sexual comments were common knowledge at the hospital but defendant failed to take action.

In Faragher v. City of Boca Raton, 524 U.S. 775 (1998), the Supreme Court clarified the legal standards that apply to claims under Title VII for sexual harassment.

> [I]n order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. We directed courts to determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Most recently, we explained that Title VII does not prohibit "genuine but innocuous differences in the ways men and

women routinely interact with members of the same sex and of the opposite sex."
A recurring point in these opinions is that "simple teasing," offhand comments,
and isolated incidents (unless extremely serious) will not amount to
discriminatory changes in the "terms and conditions of employment."

These standards for judging hostility are sufficiently demanding to ensure
that Title VII does not become a "general civility code." Properly applied, they
will filter out complaints attacking "the ordinary tribulations of the workplace,
such as the sporadic use of abusive language, gender-related jokes, and occasional
teasing." We have made it clear that conduct must be extreme to amount to a
change in the terms and conditions of employment . . . .

Id. at 787-88 (internal citations omitted); see also Fred Meyer, Inc. v. BOLI, 152 Or. App. 302,

307-10, 954 P.2d 804 (1998) (in determining whether conduct created an intimidating, hostile, or

offensive working environment under Oregon law, court applied an objective standard, a totality

of the circumstances test, and focused on whether the conduct was continuous, took place over a

relatively short period of time, and interfered with complainant's ability to carry on her duties at

work); see Kortan v. California Youth Authority, 217 F.3d 1104 (9th Cir. 2000) (one or two

references to another female as a "castrating bitch," "madonna," or "regina," plus a flurry of such

remarks on one day is not sufficiently severe or pervasive to constitute a hostile environment);

see Candelore v. Clark County Sanitation Dist., 975 F.2d 588, 590 (9th Cir. 1992) (finding that

the "isolated incidents" of inappropriate behavior that "took place over a period of years" did not

create an abusive work environment).

Johnston provides evidence that she had to listen to Dr. Werner's crass comments two or

three times a week throughout her employment, in addition to his brushing against her that she

believed was intentional. This evidence is sufficient to raise a factual issue that a sexually

harassing hostile environment did exist. I will now address the *Faragher* defense.

Although an employer can be strictly liable for a supervisor's harassment under certain

circumstances, employers can escape liability if they can prove an affirmative defense first stated

by the Court in <u>Faragher</u>, 524 U.S. 775.  If no tangible employment action was taken against the employee, the employer may prove an affirmative defense by a preponderance of the evidence by showing:  (1) it exercised reasonable care to prevent and correct the harassment; and (2) the employee unreasonably failed to take advantage of any preventative or corrective opportunities or otherwise failed to avoid harm.  <u>Kohler v. Inter-Tel Technologies</u>, 244 F.3d 1167, 1169-70 (9th Cir. 2001).

Neither party addresses this issue in the briefing, but Johnston suffered a tangible adverse employment action, her demotion, with the alleged sexual harasser, Dr. Werner, as the decision maker.  Thus, I do not believe that defendant can rely on a *Faragher* defense and deny the motion for summary judgment against the sexual harassment claims.  I am not striking the defense at this point, however, so the parties may address the issue in a motion in limine.

II.    <u>Disability Discrimination</u>

Johnston alleges that defendant violated the ADA and ORS 659A.112 by demoting her because she was regarded as disabled, retaliating against her for opposing disability discrimination, and interfering with the exercise of her rights under the statutes.

Defendant argues that Johnston was not regarded as disabled because Ross' harassment took the form of skepticism about whether she was injured.

Johnston contends a jury could believe that Ross regarded her as disabled and accused her of faking her injury as his favored form of harassment.  She claims that his daily harassment, culminating in his unauthorized call to her physician's office, was severe enough to support both a hostile environment claim and an interference claim.

I will first address whether Johnston is a person protected by the ADA and then look at the individual subclaims.  She relies on the prong of the act which protects individuals who are

regarded as having an impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(2)(C).

I agree with Johnston that Ross' conduct was sufficient to create a jury question on whether he regarded Johnston as disabled. Although other arguments can be made as to Ross' motivation for the conduct, the jury will decide which is correct.

To prevail on an unlawful discharge claim under the ADA, a plaintiff must establish: (1) that he is a disabled person within the meaning of the act; (2) that he is qualified; and (3) the employer terminated him because of his disability. Cooper v. Neiman Marcus Group, 125 F.3d 786, 790 (9th Cir. 1997). I will change the third prong to fit the demotion at issue here. The causation standard for an ADA disability discrimination claim is that the plaintiff's disability was a motivating factor for the adverse employment action. This is the standard because the ADA "outlaws adverse employment decisions motivated, even in part, by animus based on a plaintiff's disability or request for an accommodation." Head v. Glacier Northwest, Inc., 413 F.3d 1053, 1065 (9th Cir. 2005). This is also the standard under the Oregon disability discrimination statute and for a retaliation claim under the ADA. Id. at 1063 n.50 (referring to reliance on the ADA for construing only certain portions of the state discrimination statute, ORS 659A.112 to 659A.139, as stated in ORS 659A.139). The causal standard for state law retaliation claims, however, is whether "'the unlawful motive was a substantial and impermissible factor in the discharge decision.'" Id. (referring to case law interpreting ORS 659A.109).

A.    Demotion

Defendant contends that Johnston was not demoted because she was regarded as disabled. Defendant notes that Johnston received a promotion while on restricted duties and received a reasonable accommodation.

Page 16 - OPINION AND ORDER

Johnston received all of the accommodations that she requested in the nature of time off and limited duty. Considering that, plus the fact that she was first promoted while still on limited duty, two months prior to the demotion, I conclude that no reasonable jury could find that Johnston's disability was a motivating factor in the demotion. Nothing about her disability changed between the promotion and later demotion and the time period was short. I grant summary judgment against the federal and state disability discrimination claims related to the demotion.

B.    Retaliation

The ADA prohibits retaliation against a person who has asserted rights under the ADA. 42 U.S.C. § 12203(a). To establish a prima facie ADA retaliation claim, a plaintiff must show: (1) he or she is engaged in a protected activity; (2) he or she suffered an adverse employment decision; and (3) there is a causal link between the protected activity and the adverse decision. Pardi v. Kaiser Foundation Hospitals, 389 F.3d 840, 849 (9th Cir. 2004). The causal link may be inferred if the adverse employment action closely follows the protected activity. Id. The *McDonnell Douglas* burden-shifting analysis is used if the plaintiff establishes a prima facie case. Brown v. City of Tucson, 336 F.3d 1181, 1186-87 (9th Cir. 2003).

Defendant argues that there is no causal connection between any allegedly protected activity and the demotion because Johnston was promoted while on work restrictions.

Johnston argues that she can support a retaliation claim through her complaints about Ross' conduct to Dr. Werner, McClure, and Dr. Franklin. For the causal connection, Johnston contends a jury could find that Dr. Werner demoted her in retaliation for her complaints causing a situation in which Dr. Werner could no longer prevent his favored employee, Ross, from being disciplined.

Page 17 - OPINION AND ORDER

This claim does not differ much from the "vanilla" discrimination claim except that it relates the demotion to Johnston's complaints about Ross rather than to her being regarded as disabled. The prior promotion, however, breaks the causal connection and makes this claim one that the jury could not accept. I grant summary judgment against the ADA retaliation claim.

As stated above, the causation standard for the state disability retaliation claim differs from the ADA standard. The standard, however, is higher for the state claim, requiring a substantial motivating factor rather than just a motivating factor. Consequently, I also grant summary judgment against the state disability retaliation claim.

    C.      <u>Interference</u>

To support this claim, Johnston relies on the daily harassment by Ross, all centered around her accommodations, and his eventual call to her physician to seek information without her consent.

Assuming that the ADA even allows a hostile environment claim, defendant contends that Johnston was not subjected to conduct from Ross that was severe enough to support a hostile environment or interference claim. Defendant notes that Ross was disciplined and caused no further problems.

Johnston does not specifically plead an ADA hostile environment claim and the Ninth Circuit has not concluded that such a claim exists under the statute. <u>See</u> <u>Brown</u>, 336 F.3d at 1190. I will assume that Johnston is only prosecuting an interference claim.

The ADA interference provision states:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C. § 12203(b).

The Ninth Circuit has decided that the language in the ADA interference provision should not be analyzed under the Title VII burden-shifting analysis but instead should be

> guided by our treatment of the [Fair Housing Act's] interference provision . . . as well as similar provisions in the [Family Medical Leave Act] and the [National Labor Relations Act]. . . .

> We have held that the language of the FHA's interference provision should be broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws.

Brown, 336 F.3d at 1191 (supervisor's demand that plaintiff stop taking medication and perform nighttime call-out or face demotion or forced retirement constitute actionable interference threats when coupled with short-term memory problems and feelings of being extremely stressed, harassed and pressured; supervisor's discussion about plaintiff with higher-level supervisors and supervisor's statements to plaintiff that she was sloughing off, goofing off, and that other employees were complaining about early departures and long lunches were not actionable).

I conclude that Johnston has raised a factual issue that Ross' harassment, particularly his contact of her physician, would be actionable under the ADA interference provision. What troubles me is that since Johnston only alleges that she was regarded as being disabled, and not actually disabled, she was not entitled to a reasonable accommodation. Kaplan v. City of North Las Vegas, 323 F.3d 1226, 1231-32 (9th Cir.), cert denied, 540 U.S. 1049 (2003). Since defendant did not have to provide the accommodations, Johnston was not exercising a right protected by the ADA. Consequently, I do not see how defendant could have interfered with her exercise of a right. Since the parties have not briefed this issue, however, I will not dismiss the claim based on it. Defendant may raise the issue at trial.

III.    Medical Leave Acts

Johnston alleges that defendant violated two provisions of the federal FMLA:  the

provision making it unlawful to interfere with, restrain, or deny the exercise or attempt to

exercise a right provided under the Act and the provision making it unlawful to discharge or

discriminate in another way against an individual for opposing a practice made unlawful under

the Act.  Johnston does not allege that she was denied leave and does not tie her demotion to her

medical leaves.  She alleges similar violations of the Oregon Family Leave Act ("OFLA").

A.    FMLA

Defendant argues that it did not violate the FMLA because Johnston was not denied any

time off and cannot prove that she suffered an adverse action because she took leave.  Defendant

notes that Johnston received a promotion after taking time off for her two non-work accidents.

According to defendant, Johnston cannot prove a retaliation claim because she did not oppose a

leave practice and suffer a negative consequence because of the opposition.

Johnston contends she has ample evidence of interference and retaliation, specifically

Ross' daily harassment about her injuries and restrictions.  For the retaliation claim, Johnston

also notes that she complained to Dr. Franklin, Dr. Werner, and McClure about Ross'

harassment.

1.    Retaliation

The FMLA makes it unlawful "for any employer to discharge or in any other manner

discriminate against any individual for opposing any practice made unlawful by this subchapter."

29 U.S.C. § 2615(a)(2).  The Ninth Circuit has not decided whether to apply the *McDonnell*

*Douglas* burden-shifting analysis to FMLA retaliation claims when there is an adverse

employment action.  Xin Liu v. Amway Corp., 347 F.3d 1125, 1136 n.10 (9th Cir. 2003).

Johnston's claim is a bit different, however, because she is claiming that the retaliatory conduct is additional harassment by Ross. I am unaware of any cases in which the FMLA retaliation claim is based on a hostile environment theory. Typically there is a termination or demotion. Johnston only argues harassment and does not rely on the demotion. See Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282 (10th Cir. 2007) (termination). Even if she did, the earlier promotion would break the causal connection for this claim also, as explained above. Johnston's facts are a better fit for an FMLA interference claim. I grant summary judgment against the FMLA retaliation claim.

2.    Interference

The FMLA makes it unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). This provision is violated "by engaging in activity that tends to chill an employee's freedom to exercise his [] rights." Bachelder v. America West Airlines, Inc., 259 F.3d 1112, 1123 (9th Cir. 2001). Examples of interference include denying leave, discouraging an employee from using leave, and using the taking of leave as a negative factor in employment actions. Xin Liu, 347 F.3d at 1133. To prevail on an FMLA interference claim resulting in termination, a plaintiff "need only prove by a preponderance of the evidence that . . . taking of FMLA-protected leave constituted a negative factor" in an employment decision. Bachelder, 259 F.3d at 1125 (explaining why McDonnell Douglas burden shifting approach would not be used).

A jury could conclude that Ross' comments, and his phone call to Johnston's doctor, discouraged Johnston from continuing to take FMLA intermittent leave and were at a sufficient level to support an FMLA interference claim. I deny the motion for summary judgment against this claim.

B.    <u>OFLA</u>

Defendant argues that the OFLA does not have a retaliation provision.

Johnston contends that the OFLA has a retaliation claim, as stated in <u>Yeager v.</u>
<u>Providence Health System Oregon</u>, 195 Or. App. 134, 138-39, 96 P.3d 862 (2004), and also
relies on the amendment to the act clarifying the retaliation claim.

I first note that the Oregon legislature has recently enacted an amendment to the statute,
making retaliation a cause of action, and making the amendment retroactive.  HB 2635-A, 74th
Leg., Reg. Sess. (Or. 2007).  However, the amendment does not become effective until January 1,
2008 and consequently does not help Johnston now.
http://www.leg.state.or.us/07reg/pubs/enact.pdf.

Under the OFLA, an employee is entitled to twelve weeks of leave within a one-year
period for several specified reasons, including to recover from a serious health condition and to
care for a sick child.  ORS 659A.159; ORS 659A.162; OAR 839-009-0250.  The OFLA makes it
an unlawful employment practice to deny family leave to an eligible employee.  ORS 659A.183.

This Court and others in the District of Oregon have observed that the OFLA does not
provide a cause of action for retaliation, and that a BOLI regulation attempting to do so is beyond
the authority delegated to the agency.  <u>See</u>  <u>Stewart v. Sears, Roebuck & Co.</u>, No. CV-04-428-
HU, 2005 WL 5142285, at *3-4 (D. Or. Apr. 15, 2005); <u>Cameron v. T-Mobile USA, Inc.</u>, No.
CV-04-272-KI, 2005 WL 1106370, at *3-4 (D. Or. Apr. 28, 2005); <u>Loumena v. Les Schwab Tire</u>
<u>Ctrs. of Portland, Inc.</u>, No. CV 02-856-KI, 2003 WL 23957142, at *6 (D. Or. Oct. 2, 2003);
<u>Mortensen v. PacifiCorp</u>, No. CV 06-541-HU, 2007 WL 405873, at *16 (D. Or. Feb. 1, 2007);
<u>Ryman v. Sears, Roebuck & Co.</u>, No. CV 05-1106-BR, 2006 WL 1720534, at *6 (D. Or. June
19, 2006).

I decline to change from my prior ruling.  I grant summary judgment against the OFLA retaliation claim.

IV.    Sexual Orientation Discrimination

Because defendant is not within the City of Portland, Johnston voluntarily dismisses her claim of sexual orientation discrimination under P.C.C. 23.01.050B.  I grant summary judgment against the claim.

V.    Wrongful Discharge

Johnston alleges that she was wrongfully discharged for opposing defendant's discriminatory acts.  Because she resigned, the discharge was in the form of a constructive discharge.

Defendant contends that Johnston cannot establish that she was constructively discharged because the working conditions, including the demotion, were not intolerable.  According to defendant, returning to work under Ross would also not be intolerable because defendant's corrective action resulted in improved conduct by Ross beginning in May 2005.  According to defendant, Johnston could not assume that Ross would return to his former allegedly harassing ways and resign before ever giving him a chance.  Alternatively, defendant contends that any opposition by Johnston to discriminatory conduct took place prior to her promotion so a jury could not conclude that she was subsequently demoted because of the opposition.

Johnston contends that jury should decide whether her working conditions were intolerable enough to support a constructive discharge.  She relies on her arguments above that she opposed violation of her family leave rights and that a causal link exists.

The Oregon Supreme Court clarified that to establish a constructive discharge claim, a plaintiff must prove the following:

(1) that the employer intentionally created or intentionally maintained specified working condition(s); (2) those working conditions were so intolerable that a reasonable person in the employee's position would have resigned because of them; (3) the employer desired to cause the employee to leave employment as a result of the working conditions *or* knew that the employee was certain, or substantially certain to leave employment as a result of those working conditions; and (4) the employee did leave the employment as a result of those working conditions.

McGanty v. Staudenraus, 321 Or. 532, 557, 901 P.2d 841 (1995) (emphasis in the original).

There are three possible sources of intolerable working conditions:  (1) Dr. Werner's harassment; (2) Ross' harassment; and (3) Johnston's demotion.  Johnston admits that Dr. Werner stopped harassing her when her two subordinate's claims of sexual orientation by Johnston were addressed.  This was prior to her decision to quit and cannot support a constructive discharge theory.  Demotions, without more, cannot support a constructive discharge theory or any demoted employee could quit and sue the employer for a termination.  Johnston admits that Ross did not harass her during the two months she was his supervisor.  Although she is sure that Ross only backed off due to the reporting structure, and that he would again begin harassing her once he was in the position of power, Johnston quit without trying even a single day in the new role.  Johnston ignores the fact that her prior complaints about Ross caused defendant to discipline him severely by a demotion.  Moreover, the discipline worked and Ross stopped the harassment.  There is no evidence that defendant would not take further action if Ross' harassment began again.  Although Johnston is free to quit, her speculation about what might happen cannot support a constructive discharge theory.

I conclude that the allegedly intolerable working conditions are not as egregious as in many cases in which plaintiffs prevail on a theory of constructive discharge.  See, McGanty, 321 Or. at 532 (plaintiff alleged that for 19 ½ months, the defendants engaged in a course of physical

and verbal sexual harassment). I grant summary judgment on the basis that Johnston was not constructively discharged and dismiss the wrongful discharge claim. I also note that this decision will limit Johnston's damages for lost wages to the date she quit.

VI.    Intentional Infliction of Emotional Distress

Johnston alleges that defendant's conduct was sufficiently outrageous to support the tort of the intentional infliction of emotional distress.

Defendant contends that none of the conduct by Ross or Dr. Werner, even when considered along with the demotion, is sufficiently severe to support this tort. Defendant also argues that Johnston cannot support even a factual issue on whether the required intent to cause severe emotional distress existed.

Johnston contends that she has produced sufficient evidence of discriminatory conduct and comments to create a factual issue on whether the situation was severe enough to support this tort.

The tort of intentional infliction of emotional distress contains the following elements:

(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct.

McGanty, 321 Or. at 543. Intent is defined to mean "where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct." Id. at 550 (emphasis omitted). The nature of the relationship between the parties affects the type of conduct that is considered actionable. Id. at 548.

"Conduct that is merely rude, boorish, tyrannical, churlish and mean [is insufficient to be actionable, and] . . . insults, harsh or intimidating words, or rude behavior ordinarily [do not]

Page 25 - OPINION AND ORDER

result in liability even when intended to cause distress." Watte v. Edgar Maeyens, Jr., 112 Or.

App. 234, 239, 828 P.2d 479, 481 (1992) (quoting Hall v. The May Dept. Stores, 292 Or. 131,

135, 637 P.2d 126, 129 (1984)).  In addition, Oregon cases which have allowed claims for

intentional infliction of emotional distress to proceed typically involve acts of psychological and

physical intimidation, racism, or sexual harassment.  See Babick v. Oregon Arena Corp., 333 Or.

401, 413, 40 P.3d 1059 (2002) (defendant's release of intoxicated and violent concertgoers who

had been detained by plaintiffs presented a threat of imminent physical harm that was presumed

grave); Kraemer v. Harding, 159 Or. App. 90, 976 P.2d 1160 (1999) (continued accusations that

a school bus driver was a child sex abuser after multiple investigations concluded that no

inappropriate conduct occurred); Wheeler v. Marathon Printing, Inc., 157 Or. App. 290, 974 P.2d

207 (1998) (co-worker continued harassment including sexual remarks even after plaintiff

attempted suicide); Lathrope-Olson v. Dept. of Transportation, 128 Or. App. 405, 408, 876 P.2d

345 (1994) (calling a Native American woman a squaw, telling her that a squaw was supposed to

walk behind her man, stating that all women were good for was between their legs, locking her

out of the work van in the rain and snow, and threatening to push her into the path of oncoming

vehicles); Mains v. II Morrow, Inc., 128 Or. App. 625, 877 P.2d 88 (1994) (supervisor's physical

assaults, including touching plaintiff's breasts, shoving plaintiff, grabbing plaintiff's ankles,

blocking plaintiff's car, and encouraging other men to do the same, and daily sexual comments);

Franklin v. Portland Community College, 100 Or. App. 465, 787 P.2d 489 (1990) (supervisor

called an African-American male by the name "boy," issued false reprimands, shoved him,

locked him in an office, and suggested that he apply elsewhere for employment).

Whether conduct constitutes an extraordinary transgression of the bounds of socially tolerable conduct is a question of law. <u>Harris v. Pameco Corp.</u>, 170 Or. App. 164, 171, 12 P.3d 524 (2000).

Johnston's situation of hearing sexual comments two or three times a week and occasionally being brushed up against is close to the conduct in <u>Lathrope-Olson</u>. The difference between the cases is in the nature of the physical contact. Johnston described Dr. Werner's physical contact as his reaching from behind her to get something off a shelf and brushing against her, as if he was trying to make the contact accidental. <u>Lathrope-Olson</u>, in contrast, included locking the plaintiff out of the van during storms and threatening to push her into the path of oncoming vehicles. <u>Mains</u> is also similar but had daily harassing remarks, rather than two or three times a week, included more egregious physical conduct, and the harasser encouraged other men to engage in the same conduct. Although Dr. Werner's alleged conduct would be unpleasant to endure, it is not the type of psychological or physical intimidation found in the cases above. I conclude that the conduct is not sufficiently severe to constitute an extraordinary transgression of the bounds of socially tolerable conduct. Accordingly, I grant summary judgment against the intentional infliction of emotional distress claim.

## CONCLUSION

The Motion for Summary Judgment of Defendant Pet's RX, Inc. dba VCA Raleigh Hills Animal Hospital (#14) is granted in part and denied in part.

IT IS SO ORDERED.

Dated this _____19th_____ day of September, 2007.

_____ /s/ Garr M. King _____
                                          Garr M. King
                                          United States District Judge